UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

JOSEPH TRICARICO,

                Plaintiff,

                **MEMORANDUM AND ORDER**

      - against -               14-cv-2415 (RRM)

CAROLYN W. COLVIN,
ACTING COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.
------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

       Plaintiff Joseph Tricarico brings this action against Carolyn W. Colvin, Acting

Commissioner of the Social Security Administration (the "Commissioner" or "SSA"), seeking

review of the SSA's determination that Tricarico is not disabled under Title II of the Social

Security Act.  Tricarico and the SSA each cross-move for judgment on the pleadings pursuant to

Federal Rule of Civil Procedure 12(c).  (Pl.'s Mem. (Doc. No. 14) at 1; Def.'s Mem. (Doc. No.

16) at 1.)  For the reasons set forth below, plaintiff's motion is DENIED and defendant's motion

is GRANTED.

## BACKGROUND

### I.    Tricarico's Disability Claim

       Tricarico worked as a police officer with the New York Police Department ("NYPD")

from August 1993 to November 2010, the last four years as a sergeant.  (Administrative R.

("Admin. R.") (Doc. No. 17) at 40, 145.)  During that time, he sustained several injuries to his

right shoulder.  (*Id.* at 209.)  He first sprained his right shoulder in September 2002, when he

attempted to climb a wall in pursuit of a suspect.  (*Id.* at 206.)  He aggravated the injury in

November 2007 when he tripped on a step in a doorway, and again in January 2008 when he tried to apprehend a suspect who resisted arrest.  (*Id.*)  He underwent arthroscopic surgery in November 2008.  (*Id.* at 209, 219.)  According to the doctor's report, this procedure provided some relief.  (*Id.* at 209.)  However, Tricarico testified that his shoulder felt the same after the surgery.  (*Id.* at 46.)  Tricarico suffered two additional injuries in the year following his surgery.  In March 2009, Tricarico sustained injuries to his lower back and right shoulder while attempting to assist a prisoner who had a seizure.  (*Id.* at 255.)  In October 2009, Tricarico slipped and fell on a wet bathroom floor, reinjuring his lower back and shoulder.  (*Id.* at 209.)  As a result of his injuries, Tricarico was placed on restricted duty at work staring in February 2008; he had reduced hours, no patrol duties, no prisoner contact, and no overtime.  (*Id.* at 161.)  He performed mostly administrative work.  (*Id.* at 45.)  In November 2010, the NYPD approved Tricarico's disability retirement.  (*Id.* at 39.)

Tricarico filed a Title II application for Social Security Disability ("SSD") benefits on April 14, 2011, alleging that he had been disabled since November 30, 2010.  (*Id.* at 125–26.)  The SSA denied his claim on June 8, 2011.  (*Id.*)  In response, Tricarico submitted a written request for an administrative hearing before an Administrative Law Judge ("ALJ"), (*id.* at 74–75), which was held on October 25, 2012.  (*Id.* at 34–56.)  Tricarico was represented by an attorney at the hearing.  (*Id.* at 21.)  On November 14, 2012, ALJ James Kearns issued a decision finding that Tricarico was not disabled under §§ 216(i) and 223(d) of the Social Security Act.  (*Id.* at 29.)  On December 28, 2012, Tricarico requested that the Appeals Council review the ALJ's decision.  (*Id.* at 17.)  The Appeals Council denied his request for review on February 12, 2014.  (*Id.* at 1–7.)  He then filed the instant action on April 14, 2014.

## II.    The Medical Evidence

Tricarico has been treated and examined by several physicians.  His treating physicians include Dr. Daniel Wilen, Dr. Joseph D'Angelo, and Dr. Salvatore Germino.  Tricarico was also examined by Dr. Glenn Babus, Dr. Answorth Allen, Dr. Aurelio Salon, and Dr. Joseph DeFeo.

### a.  Dr. Daniel Wilen

Dr. Daniel Wilen is a board-certified orthopedic surgeon.  (*Id.* at 330.)  He started treating Tricarico after Tricarico's January 2008 shoulder injury.  (*Id.* at 279–80.)  In November 2008, he performed arthroscopic surgery on Tricarico's right shoulder.  (*Id.*)

Following accidents in March and October 2009, Dr. Wilen completed an orthopedic medical narrative on July 2, 2010, examining Tricarico's right elbow, right shoulder, and spine. (*Id.* at 255–56.)  In addition to a physical examination, the narrative relied upon magnetic resonance images ("MRIs") and an electromyography ("EMG") of these areas.  (*Id.* at 256.) Although the narrative does not state when those tests were conducted, the closest MRI and EMG preceding the narrative and referenced in the record were conducted in October and September of 2009, respectively.  (*See id.* at 219, 370.)  Wilen stated that the EMG showed radiculopathy of the L4-L5 vertebrae, and that the MRIs showed impingement and partial tearing of the rotator cuff, bulges and disc hydration of several vertebrae, a cartilage damage in Tricarico's knee, and "degenerative changes with postoperative changes" in Tricarico's right shoulder.  (*Id.*)  Wilen found decreased range of motion in the lumbar spine, with flexion to sixty degrees and extension to twenty degrees.  (*Id.*)  Wilen concluded that Tricarico was "totally disabled," with "an impingement of the right shoulder, significant injuries to the lumbar spine," and was in "need of arthroscopic surgery for the right knee."  (*Id.*)

Following an examination on March 15, 2011, Dr. Wilen noted that Tricarico had cervical spine tenderness, reversal of curvature, flexion to forty degrees, extension to thirty degrees, and was taking Vicodin. (*Id.* at 330.) Dr. Wilen ordered an MRI and X-ray; the X-ray revealed no fractures, while the MRI showed disc herniation at multiple levels of Tricarico's spine. (*Id.* at 319–20.) The X-ray also indicated that Tricarico had degenerative joint disease. (*Id.* at 318.)

Tricarico returned to Dr. Wilen's office on April 1, 2011, complaining of worsening neck pain that radiated through his arms. (*Id.* at 342–43.) At this examination, Dr. Wilen noted that Tricarico's flexion was limited to thirty degrees and extension to twenty degrees, and recommended continued care, physical therapy, and medication. (*Id.*) Subsequently, Tricarico underwent a nerve conduction velocity and electromyogram test ("NCV/EMG") of the upper extremities and an MRI of his spine. (*Id.* at 344–45.) Dr. Appasaheb Naik reviewed these tests and recommended that cervical and lumbosacral traction be added to Tricarico's treatment. (*Id.* at 322, 326.) On May 13, 2011, Dr. Wilen reviewed the test results with Tricarico and prescribed pain medication. (*Id.* at 345.)

Following this series of appointments, Dr. Wilen completed a multiple impairment questionnaire dated June 1, 2011, in which he described Tricarico's prognosis as "guarded." (*Id.* at 348.) He labeled Tricarico's level of pain at an eight out of ten and his fatigue level at a six out of ten. (*Id.* at 350.) He recommended that Tricarico not work in a setting which required him to sit continuously, noting that Tricarico could only sit, stand, or walk for up to a total time of one hour each per eight-hour workday. (*Id.*) In response to prompts asking how often Tricarico would need to take unscheduled breaks at unpredictable intervals during an eight-hour workday, and how long those breaks would need to be, Dr. Wilen wrote "varies." (*Id.* at 353.)

Dr. Wilen estimated that Tricarico's condition would cause him to be absent from work more than three times per month.  (*Id.* at 354.)  In response to a prompt asking, "In your best medical opinion, what is the earliest date that the description of symptoms and limitations in this questionnaire applies?" Dr. Wilen wrote, "Lifelong."  He added that Tricarico was permanently disabled.  (*Id.*)

Dr. Wilen saw Tricarico at least three more times in 2011, on June 28, August 23, and November 18.  (*Id.* at 458–66.)  At each meeting, Tricarico reported constant pain and continued worsening of pain in his neck, which radiated down both of his arms.  (*Id.* at 458, 461, 464.)  Also, at each meeting, Tricarico showed cervical spine flexion to thirty degrees and extension to twenty degrees, along with arm weakness, difficulty with fine manipulative tasks, tingling, and numbness.  (*Id.*)  The reports also note that pain significantly affected Tricarico's quality of life.  (*Id.*)  X-rays reviewed in the August 23 and November 18 report showed degenerative joint disease in both the thoracic and the lumbosacral spine.  (*Id.* at 461.)

Dr. Wilen also saw Tricarico several times in 2012, on January 20, April 24, July 20, and October 5.  (*Id.* at 533–44.)  Tricarico presented with same symptoms, however Dr. Wilen's reports showed somewhat improved flexion and extension of the spine, with flexion of the cervical spine to forty degrees and extension to thirty degrees.  (*Id.* at 534, 537, 540, 543.)  The reports from these visits also state that Tricarico exhibited flexion of the lumbosacral spine to fifty degrees and extension to thirty degrees.  *Id.*  The October 5 report indicates, for the first time, degenerative joint disease in Tricarico's *left* shoulder.  (*Id.* at 543.)

### b.  Dr. Joseph D'Angelo

Dr. Joseph D'Angelo, an orthopedic surgeon, treated Tricarico on several occasions prior to the alleged onset of his disability.  He first saw Tricarico on January 6, 2010, and last saw him

in July 2010.  (*Id.* at 223–24.)  At the last appointment, Dr. D'Angelo concluded that Tricarico

had not made any significant recovery since his October 2009 accident despite performing his

recommended exercises daily and recommended that Tricarico have another arthroscopy.  (*Id.* at

224.)  He remarked that Tricarico's prognosis was "guarded," recognizing that even a successful

surgery might not allow Tricarico to go back to work.  (*Id.*)  He deemed Tricarico unfit for

regular police duty.  (*Id.*)

### c.  Dr. Salvatore Germino

Dr. Salvatore Germino, a chiropractor, saw Tricarico on August 29, 2011, for an

examination and evaluation.  (*Id.* at 468.)  Tricarico's chief complaints were neck pain that

radiated into his right shoulder and lower back pain that radiated into his legs.  (*Id.*)  He also

stated that standing and sitting for long periods was virtually impossible due to pain.  (*Id.*)

Dr. Germino performed a number of tests, including examining Tricarico's range of

motion, and concluded that Tricarico had abnormal flexion and extension ranges in the cervical

and lumbar spines.  (*Id.* at 468–69.)  However, Tricarico had a normal gait and no spine tilt.  (*Id.*

at 468.)  Dr. Germino recommended that Tricarico continue treatment and expected that

Tricarico would see favorable results.  (*Id.* at 469.)  He commented that Tricarico's prognosis

was good and that the recommended treatments of moist heat therapy, physiotherapy, electrical

muscle stimulation, spinal manipulation, and physical therapy could increase range of motion,

thereby improving Tricarico's ability to perform normal daily activities.  (*Id.*)  Tricarico

continued seeing Dr. Germino regularly.  (*Id.* at 472–86, 501–18.)  Tricarico made minor

improvements throughout his appointments, though his progress proved slower than Dr.

Germino expected.  (*Id.* at 501.)

### d. Dr. Glenn Babus

In July 2010, Tricarico visited Dr. Glenn Babus twice. (*Id.* at 209.) On July 1, 2010, Dr. Babus performed an initial examination of Tricarico. (*Id.* at 210.) At that time, Tricarico described his pain as a nine out of ten and "always persistent," with the intensity of the pain varying. (*Id.* at 210–11.) On July 21, 2010, Dr. Babus again examined Tricarico, and transmitted a report to Dr. D'Angelo which provided a diagnosis of right rotator cuff syndrome, lumbar disc displacement, and left lumbar radiculopathy. (*Id.* at 209.) The report stated that Tricarico had "worsening problems" since his fall. (*Id.*) Dr. Babus recommended "trial prolotherapy for [Tricarico's] right shoulder along with a selective sleeve root injection" in his spine. (*Id.*) The report states that Dr. Babus was waiting for a referral from Dr. D'Angelo to perform these procedures. (*Id.*) There is no indication from the record as to whether Dr. D'Angelo provided this referral or whether the procedures were actually performed.

### e. Dr. Answorth Allen

Also in July 2010, Dr. Answorth Allen saw Tricarico for pain in Tricarico's right shoulder. (*Id.* at 246.) Allen's consultation report states that an MRI showed postoperative changes in the acromioclavicular joint, and notes that rehab has been unsuccessful in relieving his symptoms. (*Id.*) Allen concluded that Tricarico was "a reasonable candidate for diagnostic arthroscopy, rotator cuff repair, biceps tenodesis, labral repair, and possible [acromioclavicular] joint excision." (*Id.*)

### f. Dr. Aurelio Salon

Dr. Aurelio Salon, a family practitioner, saw Tricarico on May 20, 2011, for a consultative examination. (*Id.* at 292.) Dr. Salon found that Tricarico had no restrictions on his ability to sit, stand, climb, push, pull, or carry heavy objects. (*Id.* at 295.) Tricarico complained

of knee, neck, lower back and right elbow pain. (*Id.* at 292.) He reported being able to perform daily activities including cleaning, shopping, caring for his children, showering, bathing, and dressing. (*Id.* at 293.) He also reported being able to socialize with friends, watch television, and read. (*Id.*) Dr. Salon performed a number of tests which revealed that Tricarico had full range of motion in his shoulders, elbows, forearms, wrists, hips, knees, ankles, and cervical and lumbar spines. (*Id.* at 294.) X-rays of Tricarico's knee showed no abnormal results, while an X-ray of the lumbosacral spine came back normal with the exception of a transitional vertebral body at the L5 level. (*Id.* at 297–98.) Dr. Salon noted that though Tricarico was obese, he had a normal gait, did not require assistance to change or get on the examination table, could walk on his heels and toes, did not use any assistive device, and could get out of a chair without difficulty. (*Id.* at 293.) He diagnosed Tricarico with a history of cervical and lumbar radiculopathy, a history of surgery of right shoulder with re-injury, a history of right elbow pain and right knee pain, a history of hypothyroidism, and obesity. (*Id.* at 295.) He saw no reason why Tricarico would be restricted in his ability to sit or stand. (*Id.*)

 **g. Dr. Joseph DeFeo**

  Dr. Joseph DeFeo, an orthopedic surgeon, saw Tricarico on July 17, 2013, eight months after the ALJ's decision. (Pl.'s Mem. Ex. A (Doc. No. 14-1) at 1; Def.'s Mem. at 11.) Tricarico complained of continued pain in his right shoulder, rating the pain at an eight out of ten. (Pl.'s Mem. Ex. A at 2.) Dr. DeFeo's examination showed that Tricarico had limited motion in his right shoulder, decreased lumbar spine range of motion, difficulty with heel-toe and tandem walking, pain in his lumbar vertebrae, and weakness of hip flexors, among other ailments. (*Id.* at 3.) Dr. DeFeo filled out a questionnaire after the examination stating his conclusion that Tricarico had multilevel spondylosis involving the cervical and lumbosacral spine with

secondary radiculopathy and resultant motor weakness and muscle atrophy.  (Pl.'s Mem. Ex. B

(Doc. No. 14-2) at 1.)  He rated Tricarico's disability as "total" and his prognosis as "fair."  (Pl.'s

Mem. Ex. A at 5.)  He believed that the limitations needed for Tricarico to rejoin the workforce

would be so numerous as to preclude him from finding gainful employment.  (*Id.*)  According to

Dr. DeFeo, Tricarico needed to avoid lifting, carrying, sitting, and standing for long periods of

time.  (*Id.*)  He believed that Tricarico would not be able to sit, stand, or walk continuously, and

would need to move around hourly.  (Pl.'s Mem. Ex. B at 3–4.)  These needs could result in

Tricarico being absent from work more than three times per month.  (*Id.* at 7.)  He noted that

Tricarico's limited ability to use his hands, with a markedly limited right hand and a moderately

limited left hand, affected his ability to grasp, turn objects, twist objects, perform fine

manipulations, and reach overhead.  (*Id.* at 4–5.)  Dr. DeFeo also recommended that Tricarico

avoid wetness, extreme temperatures, humidity, heights, pushing, pulling, kneeling, bending, and

stooping.  (*Id.* at 7.)  In response to a prompt asking, "In your best medical opinion, what is the

earliest date that the description of symptoms and limitations in this questionnaire applies?"

DeFeo wrote what appears to be "Oct 2010."  (*Id.*)

## III.    Hearing Testimony

At the administrative hearing on October 25, 2012, only Tricarico and a vocational expert

("VE") testified.  (Admin. R. at 36–56.)

### a.  Tricarico

Tricarico testified that he collects a disability pension from the NYPD.  (*Id.* at 39.)

According to Tricarico, he started collecting the pension in November 2010 when he stopped

working because of pain in his shoulder, lower back, neck, and right knee.  (*Id.* at 39–40.)

Though he had surgery on his right shoulder, Tricarico testified that it did not help ease the pain.

(*Id.* at 46.)  Tricarico stated that he takes several medications for pain relief and to treat hypothyroidism.  (*Id.* at 41.)  According to Tricarico, these medications sometimes cause him dizziness, drowsiness, and clouded concentration.  (*Id.* at 41, 47.)  Tricarico also reported having difficulty sleeping due to the pain; as a result, he takes naps daily for one to two hours.  (*Id.* at 48–49.)  Tricarico testified that after about an hour of sitting he experiences lower back pain and tingling in his leg.  (*Id.* at 43.)  The numbness requires him to stand for five to ten minutes to readjust his position.  (*Id.* at 45.)  Additionally, walking for half an hour to an hour sometimes causes him pain in his lower back, shoulder, and knee.  (*Id.*)

Tricarico testified that he lives with his wife, his two sons aged four and six, and his one year-old daughter.  (*Id.* at 38.)  Tricarico takes care of his daughter while his wife is at work and brings his middle child, who is on the autism spectrum, to therapy.  (*Id.* at 38, 41–42.)  He has difficulty picking up his daughter who, at the time of the hearing, he believed weighed twenty-one pounds.  (*Id.* at 44.)  He is able to drive and occasionally assists in household tasks such as polishing and picking up clothes.  (*Id.* at 41–42.)

### b.  Vocational Expert

The VE, Timothy Janikowski, testified that although Tricarico could not perform his previous jobs, there were jobs that existed in the local economy that he could perform.  (*Id.* at 50.)  The ALJ asked the VE what type of work could be performed by a hypothetical individual "limited to sedentary work except they could only perform simple and repetitive tasks; that have the option to sit or stand at will[, who] couldn't do any overhead reach[ing] and . . . also must avoid concentrated exposure to extreme heat and cold, wetness and humidity."  (*Id.*)  The VE testified that such an individual could perform sedentary work that is unskilled in nature and gave examples of unskilled jobs such as working as a surveillance system monitor, a charge

account clerk, or a final assembler.  (*Id.* at 50–51.)  In total, there were 2,300 such jobs available

within the region.  (*Id.* at 51.)  However, the ALJ testified that a person who had three

unscheduled absences per month or required breaks taking him off task for one to two hours total

per day would not be able perform any of those jobs.  (*Id.* at 52–54.)

IV.     **The ALJ's Decision**

In a decision dated November 14, 2012, the ALJ concluded that Tricarico was not

disabled under the Social Security Act.  (*Id.* at 29.)  After determining that Tricarico met the

insured status requirements of the Social Security Act through December 31, 2015, the ALJ

undertook a five-step analysis of Tricarico's claim.  (*Id.* at 23–29.)  First, the ALJ found that

Tricarico had not engaged in substantial gainful activity since November 30, 2010.  (*Id.* at 23.)

Second, the ALJ found that Tricarico had the following severe impairments: obesity and

disorders of the back and knee.  (*Id.*)  Third, the ALJ found that Tricarico did not have any

impairments or combination of impairments that meet or exceed those listed in 20 C.F.R. Part

404, Subpart B, Appendix 1 which could compel the conclusion that Tricarico was disabled.

(*Id.*)  *See* 20 CFR §§ 404.1520(d), 404.1525, 404.1526; *see also* 20 C.F.R. § 404.1509.  Fourth,

the ALJ determined that Tricarico had the residual functional capacity ("RFC") to perform

unskilled sedentary work involving simple and repetitive tasks, provided he can sit or stand at

will, not engage in overhead reaching, and avoid exposure to extreme heat and cold, and wetness

and humidity.  (*Id.* at 24.)  As a result, he determined that Tricarico did not have sufficient RFC

to perform the requirements of his past relevant work.  (*Id.* at 28.)  Fifth, the ALJ determined that

jobs existed in significant numbers in the national economy that Tricarico could still perform.

(*Id.*)  Tricarico was therefore not disabled, as defined in the SSA.  (*Id.* at 29.)

In determining Tricarico's RFC, the ALJ assigned "limited" or "little weight" to treating physician Dr. Wilen's opinion, concluding that the conservative course of care that Dr. Wilen prescribed was inconsistent with the extreme limitations he described. (*Id.* at 27.) The ALJ also found the medical opinion inconsistent with Tricarico's description of his daily activities including taking care of his daughter. (*Id.*) In addition, he noted that Tricarico would not consent to any surgical intervention after the most recent injury, against the recommendation of multiple providers. (*Id.*) In contrast, the ALJ assigned "great weight" to Dr. Salon's opinion, which he believed was more consistent with the conservative care being administered. (*Id.*) The ALJ also gave "significant weight" to Dr. D'Angelo's opinion, even though this opinion was completed before the claimant's alleged onset date, because he concluded that the record did not show any significant change in Tricarico's condition since the last time Dr. D'Angelo examined him. (*Id.* at 26.)

## V.     The Appeal and Instant Complaint

On December 28, 2012, Tricarico requested that the Appeals Council review the ALJ's decision. (*Id.* at 17.) The Appeals Council noted the submissions from Dr. DeFeo, but declined to consider them, finding that the documents did not relate to the period prior to the ALJ's decision. (*Id.* at 2.) The Appeals Council concluded that there was no basis to review the ALJ's decision and denied Tricarico's request on February 12, 2014, rendering the ALJ's decision the final decision of the Commissioner. (*Id.* at 1–2.) On April 14, 2014, Tricarico filed the instant complaint. (Compl. at 1.) On October 21, 2014, he filed a motion for judgment on the pleadings, arguing that the ALJ erred by failing to follow the treating physician rule and failing to properly evaluate Tricarico's credibility. (Pl.'s Mem. at 9–17.) He also argued that the

Appeals Council erred by not properly considering the submission from Dr. DeFeo. (*Id.* at 17–19.) The Commissioner cross-moved for summary judgment. (Def.'s Mem.)

## STANDARD OF REVIEW

### I. Review of Denial of Social Security Benefits

The Court does not make an independent determination about whether a claimant is disabled when reviewing the final determination of the Commissioner. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the Court "may set aside the Commissioner's determination that a claimant is not disabled only if the [ALJ's] factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "'[S]ubstantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks omitted). "If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld." *Stemmerman v. Colvin*, No. 13-CV-241 (SLT), 2014 WL 4161964, at *6 (E.D.N.Y. Aug. 19, 2014) (citing 42 U.S.C. § 405(g)). "This deferential standard of review does not apply, however, to the ALJ's legal conclusions." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010). Rather, "[w]here an error of law has been made that might have affected the disposition of the case, [an ALJ's]

failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).

## II.     Eligibility for Disability Benefits

To qualify for disability insurance benefits, an individual must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(2)(A). This requires a five-step analysis for determining whether a claimant is disabled:

> [1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> [2] If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.
>
> [3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Commissioner will consider him *per se* disabled.
>
> [4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.
>
> [5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)); *see also* 20 C.F.R. §§ 404.1520, 416.920.  The claimant has the burden of proof for the first four steps of the analysis, but the burden shifts to the Commissioner for the fifth step.  *See Talavera*, 697 F.3d at 151.

**DISCUSSION**

## I.      The ALJ's Determination

Tricarico's challenge to the ALJ's decision focuses on the ALJ's RFC determination, made prior to step four of the above five-step analysis.  (Admin. R. at 24–25.)  Tricarico argues that the ALJ's determination of his RFC, and ultimately his determination that Tricarico was not disabled, was not supported by substantial evidence because the ALJ did not properly apply the "treating physician rule," and did not properly evaluate Tricarico's credibility in making this determination.  (Pl.'s Mem. at 9–17.)

### A.      The Treating Physician Rule

The regulations governing the ALJ's deliberation state that:

> Generally, [the ALJ] give[s] more weight to opinions from [a claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2).  The treating physician's opinion on the nature and severity of the patient's impairment is generally given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  *Id.*  Where the ALJ assigns less than controlling weight to the treating physician's opinion, he is required to provide "good reasons" for doing so.  *Id.* ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."); *see also Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (upholding these regulations as valid and binding on the courts).

Tricarico argues that the ALJ failed to follow the treating physician rule by not giving controlling weight to Dr. Wilen's opinions. (*See* Pl.'s Mem. at 9–10; Admin. R. at 27.) As a threshold matter, the question of whether a claimant meets the statutory definition of disability is one reserved for the ALJ. 20 C.F.R. § 404.1527(d)(1); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). Dr. Wilen's July 2, 2010, narrative states that Tricarico was "currently totally disabled." (Admin. R. at 256.) His June 1, 2011, multiple impairment questionnaire similarly states that Tricarico "is permanently disabled." (*Id.* at 354.) The ALJ was not required to defer to either of these ultimate legal conclusions.

As to the July 2, 2010, report, the limitations that Dr. Wilen provided related only to Tricarico's duties as a police officer – apprehending criminals, hand to hand combat, handling emotionally disturbed individuals, carrying weight and equipment, climbing steps, and handling a firearm – and say nothing of his ability to perform light or sedentary work. (*Id.* at 256.) Regardless of the weight that he assigned Dr. Wilen's opinion as to Tricarico's specific limitations, the ALJ's own RFC assessment contained limitations *more* restrictive than those identified in Dr. Wilen's report. (*See id.* at 24.) Thus, although the ALJ assigned little weight to Dr. Wilen's conclusion, the limitations that Dr. Wilen assigned are not at odds with the ALJ's with respect to the nature and severity of the Tricarico's impairment.

However, the ALJ did decline to adopt Dr. Wilen's conclusions contained in the June 1, 2011, multiple impairment questionnaire as to the nature and severity of Tricarico's limitations. But, he provided "good reasons" for doing so. Specifically, the ALJ assigned limited weight to the opinion because he found that it was not consistent with the conservative care prescribed, Tricarico's activities of daily living, the fact that Tricarico was able to continue working at the

light level after his most recent injury, and the fact that the record did not show any increased injuries or treatment around the time that Tricarico stopped working.  (Admin. R. at 27.)

While the fact that a doctor  prescribed a conservative course of treatment, on its own, does not constitute substantial evidence that a claimant is not disabled, it may help support such a conclusion if it is accompanied by other substantial evidence in the record.  *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (quoting *Shaw v. Chater*, 221 F.3d 126, 134–35 (2d Cir. 2000) and citing *Diaz v. Shalala*, 59 F.3d 307, 314 (2d Cir. 1995) ("The ALJ and the judge may not 'impose[ ] their [respective] notion[s] that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered . . . .' . . . [A conservative course of treatment] may, however, help to support the . . . conclusion that the claimant is not disabled if that fact is accompanied by other substantial evidence in the record.").  Although other physicians did recommend that Tricarico undergo additional surgery, there is no indication in the record of any such recommendation by Dr. Wilen.  The care prescribed by the only physician to conclude that Tricarico was unable to work was therefore limited to medication management and physical therapy.  (*See* Admin. R. at 352.)  Moreover, this is not the only evidence upon which the ALJ relied in limiting Dr. Wilen's opinion.

The ALJ also pointed to Tricarico's activities of daily living.  (Admin. R. at 27.)  While a claimant "need not be an invalid to be found disabled under the Social Security Act," *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998), Tricarico's ability to perform a broad range of activities supports the ALJ's decision to discount Dr. Wilen's conclusion.  At his hearing, Tricarico testified that he could drive, and takes his soon to school, physical therapy and doctors' appointments.  (Admin. R. at 39, 41.)  He also testified that he was able to occasionally lift his daughter, who he estimated weighed about twenty-one pounds, albeit with some pain.  (*Id.* at

47.)  In May 2011, Tricarico told Dr. Salon that he could also clean, go shopping, take care of his children, shower, bathe, dress himself, watch TV, read, and socialize with friends.  (*Id.* at 293.) Tricarico also noted many of these activities, and more, in a questionnaire he filled out in June 2011.  (*See id.* at 151–61.)  Tricarico acknowledged doing therapeutic exercises, preparing breakfast for he and his son, making minor household repairs, driving, shopping roughly once per week, and attending church and social gatherings on a weekly basis.  (*Id.*)  These activities are consistent with an individual who can perform work within the limitations that the ALJ found, and not consistent with Dr. Wilen's conclusions that Tricarico could not sit, stand, or walk for a single hour in an eight hour workday, could never lift or carry even weights between zero and five pounds, and was incapable of even "low stress" work.

The ALJ also pointed to the fact that Tricarico was able to continue working at the light level after his most recent injury, and the fact that the record did not show any increased injuries or treatment around the time that Tricarico stopped working.  (Admin. R. at 27.)  An ALJ is "entitled to rely not only on what the record says, but also on what it does not say."  *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983).  Tricarico alleges that his disability began on November 30, 2010.  (Admin. R. at 125.)  Dr. Wilen's June 1, 2011, report, completed more than six months later, provides no opinion as to when the extreme limitations that he identifies began.[1]  Tricarico's most recent injury prior to his alleged onset date was in October 2009.  (*See id.* at 209.)  Tricarico continued to work at the light level for more than year after this injury. Although a claimant can simultaneously be both "working full time and . . . disabled from working full time," *Zurndorfer v. Unum Life Ins. Co. of Am.*, 543 F. Supp. 2d 242, 260 (S.D.N.Y.

---

[1] Dr. Wilen's response to the prompt asking, "In your best medical opinion, what is the earliest date that the description of symptoms and limitations in this questionnaire applies?" was "Lifelong."  (Admin. R. at 354.)  The Court interprets this to mean that Dr. Wilen believed that Tricarico's limitations would last for the rest of his life, as it has never been suggested that Tricarico was always disabled.

2008), the only reason given in the record for why he was unsuited for his particular job is Dr.

D'Angelo's observation that Tricarico's shoulder had not made a complete recovery because

Tricarico's "duties in the light duty type environment . . . may occasionally involve contact with

a perpetrator." (Admin. R. at 285.) Tricarico also challenges the ALJ's conclusion that the

record shows no evidence of increased injuries around the time of his alleged onset date by

pointing to a patient visit note from Dr. Wilen dated April 1, 2011, that states, "[n]eck pain

getting worse." (Pl.'s Mem. at 11; Admin. R. at 342.) This isolated note, made four months

after the alleged onset of disability, does not undermine the factual basis of the ALJ's

conclusion.

Based on the foregoing, the ALJ's conclusion that Dr. Wilen's opinion was inconsistent

with the other substantial evidence in Tricarcio's case record was itself supported by substantial

evidence.

Tricarico argues in the alternative that even if the ALJ was not required to give

controlling weight to Dr. Wilen's opinion, he nevertheless erred in not giving it sufficient

deference. Once the ALJ concludes that the treating physician's opinion is not entitled to

controlling weight, he must consider the following factors in determining how much weight to

assign the opinion:

> (i) the frequency of examination and the length, nature and extent of the
> treatment relationship; (ii) the evidence in support of the treating physician's
> opinion; (iii) the consistency of the opinion with the record as a whole; (iv)
> whether the opinion is from a specialist; and (v) other factors brought to the
> Social Security Administration's attention that tend to support or contradict
> the opinion.

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). "[W]here an ALJ does not appear to have

taken into consideration [these factors], the Court cannot find that the ALJ's determination is

supported by substantial evidence." *Sanchez v. Colvin*, No. 13-CV-929 (MKB), 2014 WL

4065091, at *12 (E.D.N.Y. Aug. 14, 2014).  However, the ALJ is not required to expressly discuss and analyze each of the factors; it is sufficient that "the ALJ's reasoning and adherence to the regulation are clear" from his opinion.  *See Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (citing *Halloran*, 362 F.3d at 31–32).

Although the ALJ's opinion does not enumerate the factors, his reasoning and adherence to the regulation are clear.  The ALJ notes that "during the relevant period [Tricarico] was primarily followed by Dr. Wilen with medication management," seeing him "between every one to three months."  (Admin. R. at 25.)  Although the frequency and length of the relationship was significant, the ALJ concluded that the conservative nature of the treatment did support deference to the limitations that Dr. Wilen asserted.  (*See id.* at 27.)  The ALJ also discussed the evidence from the relevant period underlying Dr. Wilen's opinion, including a cervical spine X-ray conducted on March 15, 2011, a cervical spine MRI conducted on March 20, 2011, EMG testing conducted on April 13, 2011, and EMG testing conducted on April 27, 2011.  (*See id.* at 25–26.)  As discussed above, the ALJ concluded that Dr. Wilen's conclusions were inconsistent with both the conservative course of treatment prescribed and Tricarico's activities of daily living.  (*Id.* at 27.)   Finally, the ALJ acknowledged that Dr. Wilen was an orthopedist.  (*See id.* at 24).  While this factor tends to support assigning more weight to Dr. Wilen's conclusions, it is clear from the ALJ's opinion that it was not sufficient to overcome his view of the other factors.

The ALJ's decision to assign little weight to Dr. Wilen's opinion was therefore supported by substantial evidence and is not based on any legal error, and does not require remand.

### B.    Tricarico's Credibility

Tricarico claims that the ALJ improperly evaluated his credibility, "fail[ing] to give a single tangible reason" for his conclusion that Tricarico's "statements concerning the

intensity, persistence and limiting effects of [his] symptoms [were] not credible" to the extent

they were inconsistent the ALJ's RFC determination.  (Pl.'s Mem. at 15; Admin. R. at 25.)  The

ALJ, as a fact-finder, is free to accept or reject testimony of a witness.  *Williams on Behalf of

Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988).  However, the ALJ must set forth the

finding that a witness is not credible "with sufficient specificity to permit intelligible plenary

review of the record."  *Id.*

The ALJ must analyze the credibility of a claimant as to his symptoms through a two-step

test.  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  The ALJ must first decide "whether the

claimant suffers from a medically determinable impairment that could reasonably be expected to

produce the symptoms alleged."  *Id.* (citing 20 C.F.R. § 404.1529(b)).  Next, if the ALJ

determines the claimant does have such an impairment, he must consider "'the extent to which

the claimant's symptoms can reasonably be accepted as consistent with the objective medical

evidence and other evidence' of record."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010)

(quoting 20 C.F.R. § 404.1529(a) (alterations omitted)).  The credibility inquiry implicates the

following factors for consideration:

> (1) the claimant's daily activities; (2) the location, duration, frequency, and
> intensity of the pain; (3) precipitating and aggravating factors; (4) the type,
> dosage, effectiveness, and side effects of any medications taken to alleviate
> the pain; (5) any treatment, other than medication, that the claimant has
> received; (6) any other measures that the claimant employs to relieve the pain;
> and (7) other factors concerning the claimant's functional limitations and
> restrictions as a result of the pain.

*Meadors v. Astrue*, 370 F. App'x 179, 184 n.1 (2d Cir. 2010) (citing 20 C.F.R. §

404.1529(c)(3)).  "While it is not sufficient for the ALJ to make a single, conclusory statement

that the claimant is not credible or simply recite the relevant factors, remand is not required

where the evidence of record permits [the Court] to glean the rationale of the ALJ's [credibility]

decision."  *Cichocki v. Astrue*, 534 Fed. App'x. 71, 76 (2d. Cir. 2013) (quoting *Mongeur v.*

*Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)) (internal quotation marks omitted).  In such a case, "the ALJ's failure to discuss those factors not relevant to his credibility determination does not require remand."  *Id.*

Although the ALJ does explicitly state that plaintiff suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged, the fact that he went on to make findings concerning the intensity, persistence, and limiting effects of Tricarico's symptoms reflects an implicit affirmative finding in Tricarico's favor as to the first step.

With respect to the second step, as discussed above, the ALJ gave significant consideration to Tricarico's "relatively busy activities of daily living," which he concluded were not consistent with the limitations that Tricarico asserted.  (Admin. R. at 28.)  The ALJ also considered Tricarico's course of treatment, noting both Tricarico's refusal to undergo additional surgical intervention and the fact that his doctors managed his pain primarily with medication.  (*Id.* at 25.)  The ALJ noted that Tricarico stopped physical therapy in August 2010.  (*Id.*)  Additionally, the ALJ pointed out that Tricarico continued to work at the light duty level until receiving his disability pension, and added that the record was devoid of any indication that Tricarico subsequently looked for less physically demanding work.  (*Id.* at 26.)

The ALJ thoroughly explained his credibility determination and the record evidence permits the Court to glean the rationale of the ALJ's decision.  Thus, the ALJ's determination that Tricarico was not entirely credible regarding the intensity, persistence, and limiting effects of his symptoms was supported by substantial evidence in the record.

## II.    The Appeals Council and Dr. DeFeo's Report

Tricarico also challenges the Appeals Council's decision not to consider Dr. DeFeo's report.  The regulations direct the Appeals Council to consider "new and material evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."  20 C.F.R. § 404.970(b).  "Evidence is 'new' if it was not considered by the ALJ and is 'not merely cumulative of what is already in the record,' and it is 'material' if it 'is both relevant to the claimant's condition during the time period for which benefits were denied and probative.'"  *Sistrunk v. Colvin*, No. 14-CV-3208 (JG), 2015 WL 403207, at *7 (E.D.N.Y. Jan. 28, 2015) (quoting *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991)).  "Materiality also requires 'a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide the claimant's application differently.'"  *Id.* (quoting *Jones*, 949 F.2d at 60).

Dr. DeFeo examined Tricarico on July 17, 2013, eight months after the ALJ's decision. (Pl.'s Mem. Ex. A at 1.)  The only argument that Tricarico sets forth to suggest that the report relates to the period prior to the ALJ's decision is the fact that Dr. DeFeo examined Tricarico's medical records and responded to a questionnaire prompt indicating that the earliest date that the description of symptoms and limitations applies was "Oct 2010."  (Pl.'s Mem. Ex. B at 7.)  The only other mention of October 2010 in Dr. DeFeo's report, which lists the dates of all of the records that he reviewed, is in reference to the date that the NYPD granted Tricarico disability retirement.  (Pl's Mem. Ex. A at 1.)

Dr. DeFeo's report does not present new evidence as to the relevant period.  His discussion of Tricarico's work and treatment history is cumulative of evidence already in the record, none of which is disputed.  (*See id.* at 1–2.)  DeFeo's examination notes describe Tricarico only as he presented at the time of the examination, eight months after the ALJ's

decision.  (*Id.* at 2–3.)  Finally, none of the medical records examined by Dr. DeFeo are from October 2010.  (*See id.* at 3–4.)

Because Dr. DeFeo's report reveals no basis for his conclusion that Tricarico symptoms as described in his report began in October 2010, his report also does not meet the materiality requirement for new evidence, as there is no reasonable possibility that this single notation would have influenced the Commissioner to decide the claimant's application differently.  The Appeals Council therefore did not err in declining to consider Dr. DeFeo's report.

## CONCLUSION

For the reasons herein, defendant's motion for judgment on the pleadings is GRANTED, plaintiff's motion for judgment on the pleadings is DENIED, and the case is DISMISSED.  The Clerk of Court is respectfully directed to enter the accompanying judgment and close this case.

SO ORDERED.

*Roslynn R. Mauskopf*

Dated: Brooklyn, New York
      September 28, 2015

_____
ROSLYNN R. MAUSKOPF
United States District Judge